Not For Publication

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                      )
IN RE:                                ) CASE NO.      08-30377 (LMW)
                                      )
  THE STANDARD BEEF COMPANY,          ) CHAPTER       7
                                      )
        DEBTOR.                       ) ECF NOS.      461, 468
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## APPEARANCES

| | |
|---|---|
| Carl T. Gulliver, Esq.<br>Timothy D. Miltenberger, Esq.<br>Coan, Lewendon, Gulliver<br> & Miltenberger, P.C.<br>495 Orange Street<br>New Haven, CT 06511 | Attorney for the Debtor/Movant |
| David B. Zabel, Esq.<br>Cohen & Wolf, P.C.<br>1115 Broad Street<br>Bridgeport, CT 06604 | Attorney for Creditor West-Conn Meat<br> Company, Inc. |
| Howard E. Kantrovitz, Esq.<br>Kantrovitz & Brownstein<br>1 Bradley Road, Suite 305<br>Woodbridge, CT 06525 | Attorney for Creditor The Bank of Southern<br> Connecticut |
| Paul N. Gilmore, Esq.<br>Updike, Kelly & Spellacy, P.C.<br>One State Street, Suite 2400<br>P.O. Box 231277<br>Hartford, CT 06123-1277 | Attorney for the Official Committee of<br> Unsecured Creditors |
| Richard P. Finkel<br>Blum Shapiro & Company, P.C.<br>29 South Main Street<br>P.O. Box 272000<br>West Hartford, CT 06127-2000 | Accountant for the Debtor |

**MEMORANDUM AND ORDER RE:  PARTIAL DECISION ON MOTION TO COMPEL TURNOVER OF "CARVED OUT" FUNDS AND SCHEDULING STATUS CONFERENCE**

Lorraine Murphy Weil, Chief United States Bankruptcy Judge

Pursuant to certain "cash collateral" orders (discussed more fully below, the "CC Orders") of the court entered prior to plan confirmation, a $50,000.00 "carve-out" (the "Carve-Out") was established with respect to the secured claims of The Bank of Southern Connecticut ("BSC") and West-Conn Meat Company, Inc. ("West-Conn").  (*See* ECF Nos. 110, 152, 187, 265, 303, 316, 364, 393.)[1] Before the court are (a) the above-referenced debtor's (the "Debtor") Motion To Compel Turnover of "Carved Out" Funds (*see* ECF No. 461, the "Turnover Motion") and (b) West-Conn's objection to the Turnover Motion (*see* ECF No. 468, the "Turnover Objection").[2]  This court has jurisdiction over this proceeding as a core proceeding under 28 U.S.C. §§ 157(b) and 1334(b) and that certain Order dated September 21, 1984 of this District (Daly, C.J.).[3]  This memorandum constitutes the findings of fact and conclusion of law required by Rules 9014 and 7052 of the Federal Rules of Bankruptcy Procedure.

**I.    BACKGROUND**

The Debtor filed a petition under chapter 11 of the United States Bankruptcy Code on February 6, 2008.  (*See* ECF No. 1.)  As noted above, pursuant to the CC Orders (a) the Carve-Out was

---

[1] References herein to the docket of this chapter 11 case appear in the following form: "ECF No. __."

[2] BSC (collectively with West-Conn, the "Secured Creditors") supports the Turnover Objection.

[3] That order referred to the "Bankruptcy Judges for this District" *inter alia* "all proceedings arising under Title 11, U.S.C., or arising in . . . a case under Title 11, U.S.C. . . ."  This court also has jurisdiction over this postconfirmation matter pursuant to § 16.1 of the Plan (as hereafter defined).

- 2 -

established with respect to the secured claims of the Secured Creditors and (b) a "fee escrow" (the "Escrow") also was established, both measures being for the benefit of certain administrative creditors.

By Order dated July 2, 2009 (*see* ECF No. 401), the court confirmed the Debtor's Second Amended Plan of Reorganization (*see* ECF No. 389, the "Plan") which contained a certain provision (Plan § 2.1 at 15, the "Carve-Out Provision" (discussed more fully below)) in respect of the Carve-Out. The Plan further provided in relevant part that "[t]o facilitate the administration of this Plan, and only in the event this Plan is confirmed, as to allowed fees and costs accrued prior to the Confirmation Date, the Debtor's Chapter 11 counsel, special counsel, and accountants, and to the extent not yet paid, counsel to the Creditors' Committee, have agreed to forego cash payment otherwise required to be made on the Effective Date [in exchange for different treatment under the Plan]." (ECF No. 389 at 12-13.) The Plan further provided that "the Operating Company [as that term is defined in the Plan] shall pay a total of $6,000.00 monthly [an "Operating Company Payment"] divided pro-rata among Allowed Pre-Confirmation Administrative Expenses [as that term is defined in the Plan] for professional fees and costs commencing on the first day of the second full calendar month after the Effective Date [as that term is defined in the Plan]." (ECF No. 389 at 13 (the "Operating Company Payments Provision.")) Assuming that the Operating Company did not go into liquidation, the balance of such professional fee claims remaining after Operating Company Payments (and any other relevant payments by the Operating Company) was to be satisfied from the proceeds of the Note [as that term is defined in the Plan]. (*See* ECF No. 389 § Article VII at 29 *et seq*.) Subsequent to Plan confirmation, the court issued several orders approving final applications for compensation with respect to certain estate professionals: ECF No. 434 (for Coan Lewendon Gulliver & Mitenberger, LLC (the Debtor's Chapter 11 counsel, "CLG&M")); ECF No. 435 (for Tyler Cooper & Alcorn, LLP and LeClairRyan, a Professional Corporation (collectively, the Debtor's special counsel)); ECF No 436 (for Blum Shapiro

& Co., P.C. (the Debtor's accountants, "Blum Shapiro")); and ECF No. 447 (for Updike, Kelly & Spellacy, P.C. (counsel for the Official Committee of Unsecured Creditors (the "Committee"), "UKS")).

Pursuant to the Plan, the Debtor could operate its business post-confirmation provided that certain financial benchmarks were satisfied. (*See* ECF No. 389 at 32 *et seq*.) If those benchmarks were not satisfied, the Debtor's business would be liquidated by the ICAA (as that term is defined in the Plan). (*See id.*) If the Operating Company went into liquidation, the payment function of the Carve-Out Provision became operational. The Carve-Out Provision provides as follows:

> The carve out from the liens on all assets of the Debtor in the amount of $50,000.00 originally made in favor of the Creditors' Committee, *to the extent not previously ordered by the Court*[4], is transferred as of the Effective Date to the benefit of all holders of pre-confirmation professional fee Administrative Expenses and shall remain in full force and effect after confirmation of this Plan until all such fees are paid in full, except to the extent it is reduced by final payments [the "Final Payments Language"] by the Operating Company to holders of Allowed Administrative Expenses for allowed fees and expenses. Said carve out may be enforced immediately by the Debtor's counsel upon the liquidation of the Operating Company's assets, on the first proceeds realized therefrom . . . in the event of a default under the Plan Documents as described elsewhere in this Plan.

(ECF No. 389 § 2.1 at 15 (emphasis added).). The Turnover Motion asserts that "[t]he Operating Company is undergoing liquidation by the . . . [ICAA] . . . . [and that i]n accordance with the . . . [Carve-Out Provision], the . . . [Debtor] has made demand of the $50,000 carve out from the . . . [ICAA] . . . . Upon the advice of the intercreditor committee, the . . . [ICAA] . . . has failed and refused to deliver to the . . . [Debtor for pro rata distribution] the $50,000 carve out . . . ." (ECF No. 461 at 2.) Accordingly, the Debtor seeks an order compelling the ICAA to turn over the Carve-Out in the amount of $50,000.00. (*See id.*)

---

4    Italicized language hereafter is referred to as the "Disputed Language."

The Turnover Objection asserts that the Debtor overfunded the Escrow by $28,000.00 and that payments made from such overfunding should be charged against the Carve-Out pursuant to the Carve-Out Provision. (*See* ECF No. 468 at 1-2.)[5] The Turnover Objection further asserts that an additional $12,000.00 in aggregate payments paid pursuant to the Operating Company Payments Provision also should be charged against the Carve-Out pursuant to the Carve-Out Provision (specifically, the Final Payments Language). (*See* ECF No. 468 at 2.) Accordingly, the Turnover Objection would limit recovery on the Turnover Motion to no more than $10,000.00. (*See* ECF No. 468 at 2-3.)

An evidentiary hearing has not been held with respect to the Turnover Motion. The matter came on for oral argument on January 6, 2010.[6] At the conclusion of that oral argument the court stated: "I am persuaded that West-Conn and/or . . . [BSC] ought to file a disgorgement motion as an alternative form of relief to their objection and that the motion and the disgorgement should be heard together." (ECF No. 489 at 40:10-15 (court's remarks).)[7] At the conclusion of the hearing, the court carried the Turnover Motion and the Turnover Objection to February 10, 2010 and further directed that any disgorgement motion (if filed) would be scheduled for oral argument (*i.e.,* a hearing on a non-evidentiary basis) at the same time.

The Secured Creditors filed a Motion for Disgorgement (ECF No. 471, the "Disgorgement Motion") on January 15, 2010. The Disgorgement Motion seeks disgorgement from CLG&M and Blum Shapiro of administrative claim payments made from the alleged $28,000.00 Escrow overpayment. The Disgorgement Motion also seeks disgorgement of the $12,000.00 in Operating

---

[5]    The Debtor appears to take the position that the Escrow was underfunded by $2,000.00. (*See* ECF No. 526 (Exhibit A (footnote)).)

[6]    A transcript of that hearing appears in the record of this case as ECF No. 489.

[7]    Counsel for the Secured Creditors had themselves introduced the concept of disgorgement at that hearing. (*See, e.g.,* ECF No. 489 at 22 (remarks of Attorney Zabel); *id.* at 37-38 (remarks of Attorney Kantrovitz).)

Company Payments from the ultimate payees thereof. On behalf of itself and Blum Shapiro, CLG&M filed an Objection to Motion for Disgorgement (ECF No. 483, the "Disgorgement Objection"). The Disgorgement Objection denies that the payments that are the subject of the Disgorgement Motion came from the Secured Creditors' cash collateral. (*See* ECF No. 483.)

The oral argument on the four documents went forward as scheduled on February 10, 2010.[8] At the conclusion of that hearing, the court took the Turnover Motion and the Turnover Objection under advisement. (*See* ECF No. 490 at 49.) The Disgorgement Motion and the Disgorgement Objection were continued without date pending resolution of the turnover matter. (*See id.*)

On August 6, 2010, the court issued an order requiring the parties to file for the benefit of the court illustrative hypotheticals (a "Hypothetical") supporting their respective interpretations of the Final Payments Language. (*See* ECF No. 516, the "Briefing Order.") The Debtor filed its Hypothetical (ECF No. 524) and the Secured Creditors filed their Hypothetical (ECF No. 526, the "Secured Creditor Hypothetical"), both on September 3, 2010. The Secured Creditor Hypothetical went substantially beyond the scope of the Briefing Order. (*Compare* ECF No. 526 *with* ECF No. 516.) The Debtor filed a response to the Secured Creditor Hypothetical on September 20, 2010. (*See* ECF No. 527, the "Debtor Response".)

## II.    HISTORY OF THE ESCROW AND CARVE-OUT

### A.    The CC Orders

To the extent material, the history of the Escrow and the Carve-Out begins with the Second Final Order Authorizing Use of Cash Collateral dated April 10, 2008. (*See* ECF No. 110, the "Second CC Order.") The Second CC Order provided in material part as follows:

---

[8]    A transcript of that hearing appears in the record as ECF No. 490.

- 6 -

>           **ORDERED,** that in addition to the expenditure of funds . . . [authorized hereinabove] the Debtor is authorized and directed to deposit into an escrow account (the "Unsecured Creditors' Committee Professional Fees and Expense Escrow"), to be maintained by counsel for the Debtor, the sum of $25,000 on the 29th day of April 2008, and, should further cash collateral use be authorized herein, then on the first day of June and on the first day of each month thereafter, the sum of $15,000, with the rights of the parties in interest to such escrowed funds to be determined by further order of the Court as soon as practicable after the entry of this Order as the Court may reasonably accommodate, the Committee Professionals and the U.S. Trustee's Office being in disagreement over whether the Escrow is for the sole benefit of the Committee Professionals, which dispute requires judicial resolution prior to the Committee Professionals incurring significant fee and costs, and it is further
>
>           **ORDERED,** that notwithstanding anything to the contrary contained in this Order (or otherwise), (i) the post-petition liens and security interests of the Bank and West-Conn in the Post-Petition Collateral and (ii) all liens in favor of West-Conn and the Bank that were granted prior to the Petition Date shall be subject and subordinate to the rights of the Unsecured Creditors' Committee Professionals with respect to the Unsecured Creditors' Committee Professional Fees and Expense Escrow and the Carve-Out (as said Carve-Out is defined below); and is it further
>
>           **ORDERED,** that to the extent that there are not sufficient unencumbered assets in the Debtor's estate to pay the liens and secured claims of the Bank and West-Conn, and the Professional Fees and Expenses of the Committee Professionals, then all liens and claims of the Bank and West-Conn shall be subject and subordinate to the payment of the Professional Fees and Expenses of the Unsecured Creditors' Committee in an amount equal to the sum of (a) the aggregate amount of monies required by this order to be deposited into the Unsecured Creditors' Committee Professional Fees and Expense Escrow, and (b) $50,000.00 (the "Carve-Out") . . . .

(ECF No. 110 at 5-6.)

The Third Final Order Authorizing Use of Cash Collateral (ECF No. 152, the "Third CC Order") issued on April 29, 2008. The Third CC Order differs in relevant part from the Second CC Order only in that the Escrow provision therein appears as follows:

>           ORDERED, that in addition to the expenditure of funds . . . [authorized hereinabove] the Debtor is authorized and directed to deposit into an escrow account (the "Unsecured Creditors' Committee Professional Fees and Expense Escrow"), to be maintained by counsel for the Debtor, the sum of $15,000 on the first day of June and, should further cash collateral use be authorized herein, then the sum of $15,000 on the first day of each month thereafter, and the funds in such escrow account shall be available to pay the approved fees and expenses of the Committee Professionals as well as pay other approved administrative expenses of this case . . . .

(ECF No. 152 at 6.)  The Fourth Final Order Authorizing Use of Cash Collateral (ECF No. 187, the "Fourth CC Order") issued on June 9, 2008.  The Fourth CC Order does not differ from the Third CC Order in any relevant respect.  The Fifth Final Order Authorizing Use of Cash Collateral (ECF No. 265, the "Fifth CC Order") issued on August 25, 2008.  The Fifth CC Order differs in relevant part from the Fourth CC Order only in that the Escrow provision therein appears as follows:

> ORDERED, that in addition to the expenditure of funds . . . [authorized hereinabove] the Debtor is authorized and directed to deposit into an escrow account (the "Unsecured Creditors' Committee Professional Fees and Expense Escrow"), to be maintained by counsel for the Debtor, the sum of $15,000 on the first day of each month, and the funds in such escrow account shall be available to pay the approved fees and expenses of the Committee Professionals as well as pay other approved administrative expenses of this case . . . .

(ECF No. 265 at 6.)

The Sixth Final Order Authorizing Use of Cash Collateral (ECF No. 303, the "Sixth CC Order") issued on November 26, 2008.  The Sixth CC Order differs in relevant part from the Fifth CC Order only in that the Escrow provision therein provides as follows:

> ORDERED, that the Debtor is authorized and directed to deposit into the escrow account maintained by counsel for the Debtor (the "Unsecured Creditors' Committee Professional Fees and Expense Escrow") a deposit in the amount of $15,000 in addition to the funds previously deposited into such escrow account by the Debtor, and the funds in such escrow account shall be available to pay the approved fees and expenses of the Committee Professionals as well as pay other approved administrative expenses of this case . . . .

(ECF No. 303 at 6.)

The Seventh Final Order Authorizing Use of Cash Collateral (ECF No. 316, the "Seventh CC Order") issued on January 5, 2009.  The Seventh CC Order differs from the Sixth CC Order in relevant part only in that the Escrow provision therein provides as follows:

> ORDERED, that *the Debtor shall make no further deposits into the escrow account maintained by counsel for the Debtor (the "Unsecured Creditors' Committee Professional Fees and Expense Escrow")* [the "Cease Payment Provision"] and that counsel for Debtor shall maintain in said account $25,000 earmarked for payment of

>   Debtor's portion of the fees and expenses of the Mediator[9] to be disbursed when and to the extent same are allowed.  Counsel for Debtor shall use the balance in said account, to the extent of funds available after setting aside the earmarked funds for payment of the Mediator, to pay fees and expenses of the Creditors' Committee's counsel that are allowed upon its application for compensation set for hearing December 13, 2008.  After due payment of the fees and expenses of the Creditors' Committee's counsel, counsel for the Debtor shall maintain any remaining balance to pay other administrative professional fees and expenses of this case as the same have been or may be allowed . . . .

(ECF No. 316 at 6 (emphasis added).)

The Eighth Final Order Authorizing Use of Cash Collateral (ECF No. 364, the "Eighth CC Order") issued on February 27, 2009.  The Eighth CC Order differs from the Seventh CC Order in relevant part only as set forth below:

>   ORDERED, that notwithstanding anything to the contrary contained in this Order (or otherwise), (i) the post-petition liens and security interests of the Bank and West-Conn in the Post-Petition Collateral and (ii) all liens in favor of West-Conn and the Bank that were granted prior to the Petition Date shall be subject and subordinate to the rights of the *Debtor's Professionals and the Committee Professionals* with respect to the Professional Fees and Expense Escrow and the Carve-Out (as said Carve-Out is defined below), and it is further
>
>   ORDERED, that to the extent that there are not sufficient unencumbered assets in the Debtor's estate to pay the liens and secured claims of the Bank and West-Conn, and the Professional Fees and Expenses of the Committee Professionals and the Debtor's Professionals, then all liens and claims of the Bank and West-Conn shall be subject and subordinate to the payment of the Professional Fees and Expenses of *the Debtor and the Unsecured Creditors' Committee* in an amount equal to the sum of (a) the aggregate amount of monies deposited into the Professional Fees and Expense Escrow, and (b) $50,000.00 (the "Carve-Out") . . . .

(ECF No. 364 at 6 (emphasis added).)  The Ninth Final Order Authorizing Use of Cash Collateral (ECF No. 393, the "Ninth CC Order") issued on May 27, 2009.  The Ninth CC Order does not differ from the Eighth CC Order in any relevant respect.

---

   [9]   The Plan was in substantial part, the product of a mediation conducted by Richard D. Zeisler, Esq. of Zeisler & Zeisler P.C. ("Z&Z").

**B.  Escrow Deposit/Payment History and Other Relevant Information[10]**

| DATE | FUNDS IN | FUNDS OUT | PAYEE/OTHER INFORMATION |
|---|---|---|---|
| 5/13/08 | $ 25,000.00 | | |
| 6/11/08 | 15,000.00 | | |
| 8/4/08 | | $26,014.11 | UKS |
| 8/18/08 | 15,000.00 | | |
| 9/12/08 | 15,000.00 | | |
| 10/20/08 | 15,000.00 | | |
| 12/30/08 | 15,000.00 | | |
| 1/5/09 | | | Cease Payment Provision Ordered |
| 1/13/09 | | 48,390.90 | UKS |
| 3/6/09 | 15,000.00 | | |
| 3/16/09 | 10,000.00 | | |
| 3/18/09 | | 12,500 | Blum Shapiro |
| 3/18/09 | | 12,500 | CLG&M |
| 4/10/09 | | 23,430.42 | Z&Z |
| 6/22/09 | 3,000.00 | | |
| 6/29/09 | | 3,000.00 | Blum Shapiro |
| 7/2/09 | | | Plan Confirmed |
| 9/1/09 | | 2,164.57 (the "Last Payment") | CLG&M |
| | $128,000.00 | $128,000.00 | |

---

[10] The following data is derived in substantial part from Exhibit A to the Secured Creditor Hypothetical. That exhibit purports to be a true and correct copy of "a schedule provided [to the Secured Creditors' counsel] by the Debtor's counsel . . . ," (ECF No. 526 at 2). As noted above, the Debtor filed the Debtor Response (*see* ECF No. 527), but did not object to Exhibit A. Accordingly, the court has treated Exhibit A as evidence.

### III. APPLICABLE LAW

This matter presents a question of Plan interpretation and, more precisely, the question of to what extent the court may dispose of this matter without the taking of evidence. A debtor's confirmed plan of reorganization becomes a binding contract between the debtor and its creditors and is to be interpreted in accordance with general contract law. *See Breeden v. Bennett (Bennett Funding Group, Inc.),* 220 B.R. 743, 758 (Bankr. N.D.N.Y. 1997). *See also In re Worldcom, Inc.,* 352 B.R. 369, 377 (Bankr. S.D.N.Y. 2006); *In re RBS Indus., Inc.,* 115 B.R. 417, 418 n.1 (Bankr. D. Conn. 1990) (Shiff, J.). "Confirmed plans of reorganization are judgments of the Federal court, but they are construed in accordance with State law." *JMB Capital Partners, L.P. v. CRT Capital Group LLC (In re NTL, Inc.),* 295 B.R. 706, 717 (Bankr. S.D.N.Y. 2003). *Accord Bennett Funding, supra.* Those general contract principles include the Parole Evidence Rule. *See RBS Indus.,* 115 B.R. at 418 n.1. "The parole evidence rule is not and does not purport to be, a rule of interpretation. It is a rule of substantive contract law and not a rule of evidence which is exclusionary." *Liquidating Trust of Texas Gen. Petroleum Corp. v. McFarland & Tondre (In re Texas Gen. Petroleum Corp.),* 122 B.R. 306, 308 (Bankr. S.D. Tex. 1990), *aff'd*, 40 F.3d 763 (5th Cir. 1994), *cert. denied*, 514 U.S. 1128 (1995), *opinion recalled and superseded by* 52 F.3d 1330 (5th Cir. 1995). *Accord In re RBS Indus., supra.* Accordingly, the rule of decision for Plan interpretation is supplied by Connecticut law (including Connecticut law in respect of the Parole Evidence Rule).

Under Connecticut law, the Parole Evidence Rule is stated as follows:

The parole evidence rule does not of itself, therefore, forbid the presentation of parol evidence, that is, evidence outside the four corners of the contract concerning matters governed by an integrated contract, but forbids only the use of such evidence to vary or contradict the terms of such a contract. Parol evidence offered solely to vary or contradict the written terms of an integrated contract is, therefore, legally irrelevant. When offered for that purpose, it is inadmissible not because it is parol evidence, but because it is irrelevant. By implication, such evidence may still be admissible if relevant (1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral

agreement which does not vary the terms of the writing; (3) to add a missing term in a writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud . . . . These recognized exceptions are, of course, only examples of situations where the evidence (1) does not vary or contradict the contract's terms, or (2) may be considered because the contract has been shown not to be integrated; or (3) tends to show that the contract should be defeated or altered on the equitable ground that relief can be had against any deed or contract in writing founded in mistake or fraud.

*Palozie v. Palozie,* 283 Conn. 538, 548 n.8 (2007) (internal quotation marks omitted; alteration in original).

The only potential exception to the Parole Evidence Rule presented here is "ambiguity." "[Under Connecticut law] whether a contract is ambiguous is a question of law for the court." *Enviro Express, Inc. v. AIU Ins. Co.,* 279 Conn. 194, 200 (2006).

Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its term . . . . [T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous. By contrast, language is unambiguous when it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion . . . . When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract. Extrinsic evidence is always admissible, however, to explain an ambiguity appearing in the instrument.

*Poole v. City of Waterbury,* 266 Conn. 68, 88-89 (2003) (citations and internal quotation marks omitted; first and fourth alteration added).

## IV. ANALYSIS

### A. The Disputed Language

As can be seen by a review of the CC Orders discussed above, prior to entry of the Eighth CC Order, the Carve-Out benefitted only "Committee Professionals." (*See* ECF Nos. 110, 152, 187, 265, 303, 316.) The Eighth CC Order extended the benefit of the Carve-Out to the Debtor's professionals as well as the Committee's professionals. (*See* ECF No. 364.) That provision was repeated in the

Ninth CC Order. (*See* ECF No. 393.) The Carve-Out Provision states the beneficiary of the Carve-Out to be "holders of pre-confirmation professional fee Administrative Expenses," (ECF No. 389 § 2.1 at 15). The Disputed Language merely refers to the fact that at least some professionals already had an interest in the Carve-Out and any "transfer[]" to them in the Plan of an interest in the Carve-Out might be nugatory. By inserting the phrase "to the extent not previously ordered by the court," the Disputed Language resolved that technical problem. The Debtor takes substantially that position in the Debtor Response (*see* ECF No. 527 at 2), and the court deems that interpretation of the Disputed Language to be reasonable.

In essence, the Secured Creditors would use the Disputed Language to incorporate the Cease Payment Provision with respect to the Escrow into the Carve-Out Provision. That ignores two things. First, the Escrow and the Carve-Out are two separate mechanisms to pay administrative fee claims. (*See* ECF No. 316 at 7 (defining the "Carve-Out" separately from "the aggregate amount of monies deposited" into the "Professional Fees and Expense Escrow").) Second, the subject of the Carve-Out Provision is the Carve-Out, not the Professional Fees and Expense Escrow. (*See* ECF No. 389 § 2.1 at 15.) Accordingly, the Disputed Language cannot reasonably be read to import the Cease Payment Provision into the Carve-Out Provision.

As discussed above, the Debtor's interpretation of the Disputed Language is reasonable; the Secured Creditors' interpretation of the Disputed Language is not. Therefore, the Disputed Language is not ambiguous and no evidence need be taken for the court to conclude that the Secured Creditors' interpretation of the Disputed Language cannot prevail. Accordingly, the court concludes that, although payments made from the alleged overfunding of the Escrow may be vulnerable on other grounds, such payments need not be charged against the Carve-Out solely because they are payments from an (alleged) Escrow overfunding.

**B.     The Operating Company Payments**

As noted above, an aggregate of $12,000.00 was paid in Operating Company Payments for pro rata distribution among Allowed Pre-Confirmation Administrative Expenses.[11] The Secured Creditors argue that the Carve-Out must be reduced by the aggregate amount of those payments in accordance with the Carve-Out Provision. The Secured Creditors interpret the Final Payments Language to mean that the Operating Company Payments constitute "final payments" provided only that "there was no string to get those . . . payments to administrative claimants back to the Operating Company or anybody else," (ECF No. 489 at 25:15-18 (statement by Attorney Zabel)). That is a commonly used articulation of the concept of finality of payment. *Cf., e.g.,* 11 Am. Jur. 2d *Bills and Notes* § 372 (2011); Restatement (Third) of Restitution and Unjust Enrichment § 67 cmt. h (2010) ("Properly understood, a rule of 'final payment' merely identifies the point at which the payor can no longer reverse or countermand its payment instruction."). The Secured Creditor Hypothetical is simple, straight forward (at least with respect to the Final Payments Language) and further supports that argument. (*Cf.* ECF No. 526.) Accordingly, the court deems the Secured Creditors' interpretation of the Final Payments Language to be reasonable.

The Debtor argues that, under the Final Payments Language, the Operating Company Payments reduce the Carve-Out only to the extent that such payments cause the aggregate amount of unpaid fee claims (*i.e.,* claims not paid in full) to fall below $50,000.00. Thus, the Debtor would import the concept of "full payment" into the concept of "final payment[]." (*See* ECF No. 524.) The problem with the Debtor's proposed interpretation of the Final Payments Language is that, taken in the context of the Plan as a whole, that language is not ambiguous. That is because the drafters of the Plan knew how to

---

[11]     That $12,000.00 figure does not include the Last Payment which (as discussed below) also might qualify as an Operating Company Payment.

use the term "final full payment" when they wanted to. For example, Plan § 5.1 provides: "The Class 1 claimant shall release all security . . . upon receipt of such *final full payment,*" (ECF No. 389 at 19-20 (emphasis added)). Similarly, Plan § 5.2 provides: "The Class 2 Claimant shall release all such security . . . upon receipt of such *final full payment,*" (ECF No. 389 at 20-21 (emphasis added)). If "final payment[]" also imports the concept of "full payment," then the term "final full payment" is at least partially redundant.

As discussed above, the correct interpretation of the term "final payment[]" can be arrived at by resort to the Plan alone and does not embrace the concept of "full . . . payment." Therefore the term is not ambiguous. Accordingly, the court need not take evidence to conclude that the Carve-Out has been reduced by $12,000.00.

### C.    **The Last Payment**

Evidence must be taken to resolve the issue of whether the Carve-Out also has been reduced by the amount of the Last Payment. That is because the Last Payment was made after Plan confirmation and it is conceivable that, given appropriate facts and circumstances, the Last Payment also may constitute an Operating Company Payment within the meaning of the Carve-Out Provision.

### V.    **CONCLUSION AND NEXT STEPS**

For the reasons discussed above, the court concludes (a) although payments made from the alleged overfunding of the Escrow may be vulnerable on other grounds, such payments need not be charged against the Carve-Out solely because they are payments from an (alleged) Escrow overfunding, (b) the Carve-Out has been reduced by Operating Company Payments in the aggregate amount of $12,000.00 and (c) evidence must be taken with respect to the proper treatment under the Carve-Out Provision of the Last Payment. A status conference is scheduled for June 15, 2011 at 11:30 a.m. at the United States Bankruptcy Court, Connecticut Financial Center, 157 Church Street, 18th floor, New

Haven, Connecticut to consider "next steps" with respect to this matter.  Further, an order scheduling a status conference for the same place and time with respect to ECF Nos. 471 and 483 (*i.e.,* the Disgorgement Motion and the Disgorgement Objection) also shall issue.

It is **SO ORDERED.**

Dated: May 23, 2011                                         BY THE COURT

*[signature]*
Lorraine Murphy Weil
Chief United States Bankruptcy Judge